Filed 12/23/22  In re Kimberly F. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re KIMBERLY F., a Person Coming Under the Juvenile Court Law. | B317759 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK21665A) |
| Plaintiff and Respondent, | |
| v. | |
| JORGE G., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant Jorge G.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant Cynthia F.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellants Jorge G. (Father) and Cynthia F. (Mother) appeal from a January 3, 2022, juvenile court order terminating their parental rights as to Kimberly F. At the time of the order, Kimberly was 13 and her juvenile court proceedings had been pending for nearly five years. Respondent Los Angeles County Department of Children and Family Services (DCFS) recommended termination of parental rights to facilitate Kimberly's adoption by her foster caregiver of almost three years, which Kimberly supported through counsel. Father and Mother both opposed termination. After a hearing, the court ordered termination and that adoption be the permanent plan for Kimberly's custody and care. Father and Mother timely appealed. We affirm.

2

# PROCEEDINGS BELOW

### A. *Initial Removal of Kimberly from Father and Mother*

On February 14, 2017, DCFS filed a petition under section 300 of the Welfare and Institutions Code.[1] DCFS alleged, inter alia, that Father and Mother had medically neglected Kimberly and her two younger siblings, neither of whom is involved in this appeal.  In April 2017, the juvenile court sustained the medical neglect allegation and ordered Kimberly released to her parents.

During subsequent home visits, a children's social worker (CSW) observed Kimberly was "flat" around her parents, from whom she "ke[pt] her distance."  In July 2017, DCFS filed a petition under section 342 presenting additional allegations of neglect and domestic violence, which the court later sustained.  The court ordered Kimberly detained in shelter care with monitored visitation for each parent.

Kimberly adapted well to her first foster home and repeatedly expressed desire to be adopted by her caregivers. Through February 2018, Father was inconsistent in visiting Kimberly, which upset her.  In May 2018, Father and Mother separated.  Through October 2018, Father reportedly struggled to engage with Kimberly, who stated she liked to

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

3

see Father from time to time "so she can receive money," but showed frustration with him on multiple occasions.

## B. *Return to Parents and Second Removal*

In March 2019, the juvenile court found each parent had made substantial progress, and ordered Kimberly returned to her parents' custody, over her counsel's objection. Kimberly initially resided with Mother and a maternal aunt in the maternal grandparents' home. Within a week, the maternal aunt reported that Mother was neglecting the children in order to prioritize her relationship with a boyfriend who was a registered sex offender. On April 2, 2019, Mother informed a CSW that she chose to "give up her children" to maintain that relationship.

The same day, Kimberly was taken to reside with Father in the paternal grandparents' home. It was almost immediately reported that Kimberly said "she wants to kill the family and she wants to be in the cemetery." One week later, Kimberly was involuntarily hospitalized, as the paternal relatives reported Kimberly continued to make similar statements. After her discharge from the hospital, Kimberly continued to make homicidal statements, criticized Father's appearance and accent, and denied Father was her father. Kimberly also struck Father and told him she hated him. On May 28, 2019, Kimberly engaged in a physical confrontation with the paternal grandmother, and was again involuntarily hospitalized.

4

In July 2019, after Kimberly briefly resided with a maternal aunt, the court again ordered Kimberly removed from the parents and detained in shelter care, with monitored visitation for Father and unmonitored visitation for Mother.

### C. *Termination of Parental Rights*

On July 12, 2019, Kimberly was placed with foster caregiver C.G. Soon after, DCFS filed a petition under section 342 alleging that Mother was both unwilling and unable to care for Kimberly, and Father was unable to care for her.

From July to September 2019, Kimberly made progress with respect to her mental health and behavior. Kimberly was observed to be "assertive" and "honest about her opinion about others." Subsequent reports similarly observed that Kimberly was assertive, honest, and capable of advocating for herself. Kimberly began to refuse to attend visits with Father and showed little interest in his regular phone calls. In September 2019, the court sustained the allegations in the section 342 petition and scheduled a section 366.26 hearing for January 2020, which was later continued to June 2021.

By March 2020, Kimberly was reported to be positively bonded with caregiver C.G. C.G. expressed a willingness to provide Kimberly with permanence through legal guardianship or long-term foster care. Beginning in October 2020, Kimberly reported a desire to be adopted, though not

by C.G. Kimberly continued to "thrive" in C.G.'s home. Father maintained consistent visitation.

On June 15, 2021, at the continued section 366.26 hearing, Kimberly's counsel informed the court that Kimberly wanted to be adopted by C.G., who by this time wanted to adopt Kimberly. After the court again continued the hearing, Kimberly and C.G. consistently expressed a desire to move forward with the adoption.

On December 3, 2021, DCFS recommended termination of Mother's and Father's parental rights and adoption as the permanent plan for Kimberly's custody and care. On December 15, 2021, Kimberly's therapist reported that Kimberly's mental health began to decline when Father told her he was attempting to reunify with her and opined that Father's visits were detrimental to Kimberly's mental health. Even then, however, Kimberly said she looked forward to Father's visits.

On January 3, 2022, the court held a section 366.26 hearing. Father and Mother each opposed termination of parental rights, arguing that the parental benefit exception applied. Kimberly argued, through counsel, that the exception did not apply, noting that Kimberly had repeatedly expressed that "she does want to be freed up for adoption, she does want to be adopted, she does want permanency." Counsel further represented that Kimberly had recently indicated "she does not want continued contact with her parents going forward." DCFS joined in that argument.

6

The juvenile court found each parent had failed to establish the third element of the parental benefit exception. The court explained, in relevant part, that "[t]he visitation and contact with the parents, especially at her age, has conferred a parental role and relationship, but the court cannot find that that parental role and relationship outweighs the benefits of permanence in adoption, nor that it would be detrimental to the child to sever the parent-child relationship."

Finding Kimberly was likely to be adopted, the court terminated Mother's and Father's parental rights and selected adoption as Kimberly's permanent plan. Each parent timely appealed.

### D. *ICWA Procedural History*

On February 14, 2017, when DCFS filed the original petition under section 300, DCFS also filed a detention report stating that Father and Mother each had denied any known Indian ancestry in response to inquiries from a CSW. Father and Mother also each filed an ICWA-020 form declaring, under penalty of perjury, "I have no Indian ancestry as far as I know." At the detention hearing on February 15, 2017, in response to an inquiry from the juvenile court, Kimberly's maternal grandmother denied any knowledge that Kimberly had Indian ancestry. The court found that it had no reason to believe Kimberly was an

Indian child and that the Indian Child Welfare Act (ICWA) did not apply in the proceedings.[2]

## DISCUSSION
### *Governing Law*

If the juvenile court cannot safely return a dependent child to the custody of a parent within statutory time limits, the court must set a hearing under section 366.26. At the hearing, the question before the court is not whether the parent may resume custody of the child. (See *In re Amber M.* (2002) 103 Cal.App.4th 681, 690.) When the court orders the section 366.26 hearing, the assumption is that the problems that led to the court taking jurisdiction have not been resolved. (*In re Caden C.* (2021) 11 Cal.5th 614, 635 (*Caden C.*).) The goal at the section 366.26 hearing is to select and implement a permanent plan for the child. (*Ibid.*)

The juvenile court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, then the court shall terminate parental rights to allow for adoption. (*Caden C.*,

---

[2] The court found Father to be Kimberly's presumed father. Mother denied that she knew the whereabouts of Kimberly's biological father or had any contact information for him or his relatives. DCFS exercised due diligence in attempting to locate the biological father, without success. We note there was no ICWA error with respect to the biological father. (See *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 ["[W]e cannot ask the agency . . . to interview individuals for whom no contact information has been provided"].)

8

*supra*, 11 Cal.5th at 635.)  But if the parent shows that termination would be detrimental to the child, the court should decline to terminate parental rights and select another permanent plan.  (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)

The Legislature enacted the parental benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i) more than 30 years ago because "'some children in foster care retain very strong ties to their . . . parents.'" (*Caden C., supra*, 11 Cal.5th at 635.)  The parental benefit exception is "limited in scope" and "'merely permit[s] the court, in exceptional circumstances, to choose an option other than the norm, which remains adoption.'" (*Id.* at 631.)  In determining whether such exceptional circumstances exist, the juvenile court "shall consider the wishes of the child."  (See § 366.26, subd. (h)(1).)

"[T]he parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted.  Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship.  And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at 636.)

9

In weighing the implications of termination against the benefits of adoption, the juvenile court may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. These factual determinations are reviewed for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at 640.) The court's ultimate decision is reviewed for abuse of discretion. (*Ibid.*)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C.*, *supra*, 11 Cal.5th at 640.) "[T]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard." (*Id.* at 641.)

### *Analysis*

Father contends the juvenile court abused its discretion in determining that he failed to establish the third element of the parental benefit exception, namely that terminating his relationship with Kimberly would be detrimental to her even when balanced against the countervailing benefits of a new, adoptive home. Mother contends the court prejudicially erred in determining ICWA did not apply without first directing ICWA inquiries to Father and Mother in open court and ensuring DCFS directed similar inquiries to several members of Kimberly's

10

extended family.  For reasons discussed below, we reject each contention.

### A. The Juvenile Court Acted Within Its Discretion in Determining Father Failed to Establish the Parental Benefit Exception

We conclude the juvenile court acted within its discretion in determining that Father failed to meet his burden to establish the third element of the parental benefit exception.  The record before the court showed that, from October 2020 to January 2022, Kimberly consistently expressed a desire to be adopted.  Kimberly was 13 years old by the time of the section 366.26 hearing and had repeatedly been reported to be assertive, honest, and capable of advocating for herself.  Kimberly was reported to have been thriving in the care of prospective adoptive parent C.G., with whom she had been positively bonded since at least March 2020.

In contrast, Kimberly's relationship with Father had for years been, at best, strained and, at times, overtaken by her overt hostility towards him.  In the months leading up to the section 366.26 hearing, Father's visits were reported by Kimberly's therapist to be detrimental to her mental health.  At the hearing, moreover, Kimberly's counsel reported she wished to cease contact with Father.  The court reasonably could have assigned great weight to Kimberly's wishes in determining that on balance, the benefits of adoption outweighed any detriment to Kimberly from the termination

11

of Father's parental rights. (See *Caden C.*, *supra*, 11 Cal.5th at 635; § 366.26, subd. (h)(1).)

As Father observes, the record contains some evidence of ambivalence on Kimberly's part, including a report that, as recently as December 2021, the month before the section 366.26 hearing, Kimberly said she looked forward to Father's visits. But by the time of the hearing, Kimberly had also expressed a desire to cease all contact with Father and be adopted by her foster caregiver of almost three years. Even if Kimberly's ambivalence could reasonably be construed as a sign that there would be some detriment to her in severing the parental relationship, it is not for this court to reweigh the evidence and substitute our judgment for that of the juvenile court. (See *Caden C.*, *supra*, 11 Cal.5th at 640-641.)

Nor may we set aside the court's selection of adoption as Kimberly's permanent plan merely because, as Father observes, prospective adoptive parent C.G. had shown a willingness to accept a legal guardianship or long-term foster care instead of adoption. The statutory preference is for adoption, regardless of whether a prospective adoptive parent may be willing to accept less permanent arrangements. (See § 366.26, subds. (b)-(c).) The parental benefit exception warrants deviation from this preference only in "exceptional" circumstances (*Caden C.*, *supra*, 11 Cal.5th at 631), which the court implicitly determined Father had not shown.

Two of the cases Father relies upon are inapposite because they do not address the third element of the

12

parental benefit exception.  (See *In re J.D.* (2021) 69 Cal.App.5th 594, 863, 865; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228-1231.)  And the third, *In re D.P.,* is distinguishable because the appellate court there concluded a parent had established the third element because "the only available evidence of bond" was her own testimony, corroborated by visitation logs, that her children had strong bonds with her and would be emotionally distressed by their loss. (*In re D.P.* (2022) 76 Cal.App.5th 153, 167.)  Here, in contrast, the evidence before the court supported a conclusion that Kimberly's bonds with Father were tenuous and uneven at best, and that their termination would not be so detrimental as to override the benefits of adoption.  (Cf. *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  In sum, we conclude the juvenile court acted within its discretion in determining that Father failed to meet his burden to establish the exceptional circumstances necessary to trigger the parental benefit exception.

### B. Any Deficiency in the ICWA Inquiry Was Harmless Error

After Father and Mother each denied any known Indian ancestry under penalty of perjury and Kimberly's maternal grandmother denied any such ancestry in open court, the juvenile court found ICWA did not apply.  Mother contends the court prejudicially erred in making this finding without first asking Father and Mother in open court whether they had reason to know that Kimberly is an Indian

child (see 25 C.F.R. § 23.107(a)), and ensuring that DCFS asked several members of Kimberly's extended family whether she is or may be an Indian child (see § 224.2, subd. (b)). DCFS does not dispute the procedural history but contends the juvenile court's omissions were harmless.

"Where . . . there is no doubt that the Department's inquiry was erroneous, our examination as to whether substantial evidence supports the juvenile court's ICWA finding ends up turning on whether that error by the Department was harmless—in other words, we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly. [Citation.] If so, the error is harmless and we should affirm; otherwise, we must send it back for the Department to conduct a more comprehensive inquiry." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777 (*Dezi C.*), review granted Sept. 21, 2022, S275578.)

Here, Father, Mother and Kimberly's maternal grandmother all denied any known Indian ancestry. None of them suggested that extended family members might have additional information. Mother has neither proffered any contrary information nor identified any in the record. Because nothing in the record suggests a reason to believe Kimberly may be an Indian child, we conclude that any deficiency in the ICWA inquiry was harmless error. (See *Dezi C.*, *supra*, 79 Cal.App.5th at 779, rev.gr.)

14

**DISPOSITION**

The order terminating Father's and Mother's parental rights as to Kimberly is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SCADUTO, J. *

We concur:

COLLINS, Acting P.J.

CURREY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.